Neville I. WINTZ, Donald Perkins, Edgar A. Jordan, George Robinson, Sidney Murray, John Sims, Raoul Beauvoir, Hector Cuevas and Andre Exume, individually and on behalf of similarly situated, Plaintiffs,

v.

The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, et al., Defendants.

No. 81 Civ. 5171(MP).

United States District Court, S.D. New York.

Nov. 30, 1982.

NAACP by Charles E. Carter, Curtis E. Rodgers, New York City, for plaintiffs.

Patrick J. Falvey by Philip A. Maurer, James M. Begley, New York City, for defendants.

## OPINION AND DECISION

MILTON POLLACK, District Judge.

Nine engineers in the Design Division of the Engineering Department of the Port Authority of New York and New Jersey have sued the Authority, its commissioners and directors claiming racial discrimination in employment practices in their department. The issues were tried to the Court at a Bench trial; all the parties and their

counsel having duly appeared and been heard and due deliberation having been had thereon, the Court decides and finds as follows:

### Jurisdiction of the Court

This action was brought under Title 42 United States Code §§ 1981, 1983 and 1985 and under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. The action was commenced after the notice of right to sue letter, dated May 18, 1981, was received by the plaintiffs. This suit was commenced on August 19, 1981. It has been stipulated by the parties that the Court lacks jurisdiction over any allegations prior to March 24, 1972, since 42 U.S.C. § 2000e et seq. was first made applicable to government employees on March 24, 1972. Article XV, § 296 of the New York Executive Law is not applicable to the Port Authority. The Equal Employment Opportunity Commission found, on May 18, 1981, that there was not reasonable cause to believe that any of the plaintiffs had been discriminated against by the defendants and dismissed the charges.

### Preliminary

This case has been prepared in exemplary fashion by both sides and that has made the task of the Court simpler in concentrating on the remaining controverted areas. Following broad but appropriate discovery, the parties spent considerable time reaching Agreed and Disputed Proposed Findings of Fact and Conclusions of Law. The Agreed Findings of Fact were admitted in evidence at the inception of the trial of each plaintiff's claim making evidence thereon no longer necessary. Days of trial time were saved. The parties further stated, succinctly, their respective contentions concerning objective ultimate facts which were controverted by the other side. These focused the remaining issues to be tried. Basically, since the facts were readily ascertainable or at least not reasonably controvertible, the trial became one on the issue of credibility and the issue of law. Thus the stage was set for the Court to resolve those issues almost as the trial was coming to a close and to reach and shortly announce a decision thereon.

### Applicable Law

#### A. Title VII

There are two principal doctrines, either one or both of which may be relevant in a Title VII case: the disparate treatment doctrine and the disparate impact doctrine. The two are described in the following excerpt:

> The "disparate treatment" doctrine holds that differential treatment of comparably qualified persons of different races justifies an inference of intentional discrimination, unless the employer produces an acceptable explanation. If the employer produces such an explanation, plaintiffs can prevail only if they demonstrate that the employer's explanation is a pretext shielding a discriminatory motive. The "disparate impact" doctrine avoids issues of discriminatory motive; it holds that the use of employment tests and other selection devices that have an adverse racial impact constitutes unlawful discrimination, regardless of the employer's good faith, unless the employer can demonstrate the job-relatedness and business necessity of such devices. Bartholet, *Application of Title VII to Jobs in High Places,* 95 Harv.L.Rev. 945, 964 (1982).

Thus, under either theory, the plaintiffs have the initial burden of showing that the employment system treats comparable blacks and whites differently. If this is met, in either case, the defendant must then explain the differences. This will then return the burden to the plaintiffs to rebut defendant's explanation. Only the "burden of production" shifts to the defendant; the evidentiary burden of proof is always with the plaintiff.

While disparate treatment cases require a showing of intent to discriminate, the plaintiff can make out a prima facie case of disparate treatment from which intent is inferred. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the defendant has met the plaintiff's proof by establishing legitimate non-discriminatory reasons, in or-

der to succeed, the plaintiff must prove that the defendant's asserted justifications were only a pretext. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The inclusion by plaintiffs of claims under 42 U.S.C. §§ 1981, 1983 and 1985 does not change the elements that plaintiffs must prove to obtain relief. It is clear that § 1981 provides no greater relief than Title VII. *See New York City Transit Authority v. Beazer,* 440 U.S. 568, 584 n. 24, 99 S.Ct. 1355, 1365 n. 24, 59 L.Ed.2d 587 (1978). The Second Circuit has extended this to § 1983 by noting that no greater or lesser protection against discrimination is provided in [Sections 1981 and 1983] than under Title VII. *See Carrion v. Yeshiva Univ.,* 535 F.2d 722, 729 (2d Cir.1976). Inclusion of these claims does not increase the plaintiffs' ability to prevail.

Section 1985(3) requires that plaintiffs establish (1) a conspiracy, (2) motivated by racial or other invidiously discriminatory animus, (3) for the purpose of depriving any person or a class of persons of equal protection of the privileges and immunities under the law, (4) that the conspirators committed some act in furtherance of the conspiracy, and (5) that the plaintiffs were injured. *Griffin v. Breckenridge,* 403 U.S. 88, 102–04, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971). This statute would not apply at all events unless the plaintiffs could show that external parties were involved since the conspiracy requirement is not met by a conspiracy within a single corporate entity. *Girard v. 94th Street and Fifth Avenue Corp.,* 530 F.2d 66 (2d Cir.1976), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976). Moreover, Section 1985(3) may not be used to redress violations of Title VII. *Great American Fed. S. & L. Assoc. v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). Thus, this Section can only play a role in an employment discrimination case when the actions of the defendant in employment discrimination violate the Constitution. As the test for a violation of the Constitution based on employment discrimi-

nation is stricter than the test under Title VII, *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (proof of discriminatory purposes required under Fourteenth Amendment), a claim under Section 1985(3) does not lessen what plaintiffs must prove to show employment discrimination.

*The Underlying Controversy*

Initially nine engineers in the Design Department of the Port Authority's Engineering Staff joined as plaintiffs, each asserting in a psuedo-class action some common form of disparate treatment based on racial discrimination on the part of the supervising personnel of the employer. Extensive pretrial discovery and a scrutiny of the Authority's personnel files as well as depositions of the plaintiffs were taken with telling effect. Five of the nine plaintiffs requested leave following this thorough investigation to dismiss their cases with prejudice and their claims were dismissed on consent accordingly just before or at the opening of the trial. The significance of these surrenders speaks loudly on the pretended broad scale charges of the common discriminatory practice, purpose and style of action of the Authority in the treatment of its employees and the conditions and opportunities in the Engineering Department of the Authority specifically. The nine had banded together as a minority group with some others to seek individual and group redress for alleged discriminatory mistreatment. The collapse of the claims of the majority of the group and their willingness to submit to a dismissal with prejudice on the eve of or at the opening of the trial impacts severely on the validity of the charges of common misconduct and in the light of the admitted signed findings of agreed fact pertaining to each of the four remaining plaintiffs and the disclosures on their cross-examinations at the trial, stamp the remainder of the claims on trial as vexatious and unsupportable charges.

Racial discrimination was affirmatively disproved, amply, convincingly and without

any credible contradiction. Plaintiffs failed to prove that they were qualified for the promotions which were given to others, that they were the best or at least equally, qualified candidates for other positions they sought, or that they were in any ways discriminated against during the years they were employed in the Design Division of the Engineering Department of the Port Authority of New York and New Jersey. The defendants, on the other hand, clearly demonstrated nondiscriminatory reasons for their actions in regard to promotions, supervisory evaluations and salary adjustments with respect to the plaintiffs. With respect to the management level jobs involved in the instant cases, the Port Authority, as an employer was entitled to make its own subjective business judgments and those judgments in no manner, shape or form were shown to have been based upon discriminatory motivations.

The Port Authority Affirmative Action Program which includes an Influx and Engineering Aid Program, a training program and a summer intern program, as well as the Equal Opportunity Council, have been used effectively to hire and place minorities and women within the organization, using the criteria established by the EEOC, namely the census guidelines.

Where the claim was of disparate or inadequate economic treatment, the evidence did not sustain it. Claims of the employer's failure to advertise job opportunities so that the respective plaintiffs did ultimately learn thereof but only too late or not at all, were demonstrated to be groundless and actually contradicted by applications made by the complainant for the allegedly unknown job opportunity.

Plaintiffs have also failed to make out a claim of disparate impact. No statistics were presented to show that any employment test or other selection device had an adverse racial impact. On the contrary, regarding the Port Authority's Middle Management Test, between 1971 and 1981, the parties agreed that 63% of the white participants were in the pass or pass reserve category, while 61% of the blacks were in these categories. Fifty-one percent of the successful white candidates were subsequently promoted into Middle Management, while 54% of the successful blacks were promoted. In addition, no statistics have been presented to show that the overall promotion scheme had an adverse racial impact.

It appears that the main reason that plaintiffs were not promoted was that the Design Division of the Engineering Department, where plaintiffs worked during most of the period in question, was contracting in size. Thus, as the number of persons employed in the Design Division fell 21.2% between 1974 and 1981, there were very few promotions to be had.

The decisions with respect to each of the plaintiffs in this case pertaining to their employment matters were based on solid business reasons and none were pretextual nor discriminatorily motivated.

More particularly in respect of the claim of each of the individual plaintiffs the Court further finds as follows:

*Neville I. Wintz*

Mr. Wintz was not discriminated against during his employment with the Port Authority. He was given a general salary adjustment based on merit for each year from 1966 to the present, with the exception of 1975 through 1977 and was given an annual merit increase each year from 1966 to the present, with the exception of 1975 through 1977. He admitted in his deposition that he had not been discriminated against with respect to transfers, discipline, job assignments, or the written Middle Management examination.

As to promotions, Mr. Wintz was promoted in June 1980 from Assistant Engineer E–3 to Associate Engineer E–4. The promotions given to others during the years he was employed in the Design Division were based on fair and neutral employment and personnel decisions.

In particular, Wintz claimed that he had applied for six positions with the Design Division. A position for which Wintz applied in August 1972 was filled by a black

male. A job as a Staff Assistant for which Wintz applied in November 1971 was filled by a black female. Jobs which Wintz claimed to have applied for in June 1972 and June 1974 were not filled at the time and there was no evidence presented that the Port Authority later attempted to fill these positions. While Wintz originally stated that he applied for a job as an Administrative Assistant in November 1972, he later stated that he did not recall applying for this position. Finally, Wintz was not qualified for the job that he applied for in February 1973 as he did not have the required number of years of experience at the supervisory level.

Wintz claimed that he had not received promotions as the method of promotion in the Design Division was for supervisors to select individuals for promotion on their own initiative. No credible evidence was presented to show that promotions in the Design Division were available other than through application.

With respect to those jobs sought by Mr. Wintz outside the Division, the persons chosen had qualifications equal to or better than Mr. Wintz and the decision to hire someone other than him was based upon discretion to choose among the equally qualified candidates and the final decision as to the person selected was not based upon race.

Wintz also asserted that his supervisor's evaluations of him were unjustifiably unfavorable in retaliation for his actions as a member of the organized group of minority engineers. He claimed that as a result of these negative evaluations he was unable to receive a promotion in the Design Division or to receive an acceptable score on the Middle Management Examination. While retaliation for organizing activities can form the basis of a Title VII claim, there is no evidence in this case to find that Wintz' evaluations were the result of retaliation or the result of any race-related factor. 42 U.S.C. § 2000e–3.

There was no credible evidence presented to show that Wintz' evaluation by his supervisor was based on any improper factor.

For example, Wintz' supervisor testified that Wintz had to be removed from one project as his work was delaying the project's timely completion. Thus, there was no proof that bad evaluations were retaliatory.

In addition, even if the bad evaluations were retaliatory, there must be proof of cause before there can be a prima facie case of retaliation. *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43 (2d Cir.1980). There is no proof that Wintz' poor evaluations were the cause of his failure to be promoted. Instead, it was shown that very few promotions were made in the Design Division over the years in question and that this was the more credible reason for the lack of promotions.

Finally, while Wintz claimed that he failed the Middle Management examination as a result of a supervisor's unfavorable evaluation, this claim has no merit. First, Wintz was rated promotable on the examination by his supervisor. This favorable review could hardly cause any failure. Second, Wintz was placed in the reserve category as a result of the test. This status was perfectly consistent with his performance on the objective parts of the test. Also, the supervisor's evaluations were only one part of the employee's score on the test. Thus, even if Wintz had received a negative evaluation, it would not necessarily have caused him to fail the test as he testified.

In addition, while Wintz claimed that his inability to obtain jobs out of the Design Division was based on supervisor's evaluations that were unduly negative due to his race, this claim has no merit as there was credible evidence presented to show that supervisor's evaluations were not forwarded to departments in which employees applied for jobs.

Thus, they could not have adversely affected him.

*Edgar A. Jordan*

Mr. Jordan has not been discriminated against because of his race during his employment with the Port Authority. He received all general salary adjustments and

scheduled merit increases from the date he commenced his employment with the Port Authority on March 31, 1969 to the present time. Having been hired as an Engineer IV, Level E–5 he was promoted to the position of Staff Services Engineer, Level B–6 in January 1974, and he admitted during his examination before trial that he had not been discriminated against with respect to pay, testing, discipline, job assignments, merit or adjusted salary increases. His only claims are that he was not promoted soon enough and that he disagreed with his supervisory evaluations. There was no credible evidence presented to show that the evaluations of Jordan were based on any factor other than work performance. In addition, Jordan specified no job for which he was qualified that was given to an equally or less qualified non-minority candidate. One job that Jordan felt should have gone to him was instead filled by an individual with greater qualifications than Jordan's. The successful candidate had advanced engineering degrees and experience in specification writing. Jordan only had a degree in journalism.

Mr. Jordan was not retaliated against because of his having filed an EEOC complaint in 1974. Promptly after the filing of that and other like complaints with the EEOC the Port Authority's Personnel Director instituted a thorough ongoing investigation of all of the facts and circumstances relevant to each and all of the complaints. In that connection, when Robert J. Winters called Mr. Jordan into his office to determine on what basis Mr. Jordan alleged he was being discriminated against this was not an act of harassment but was part of the ongoing investigation of the facts involved and underlying the various complaints. The New York Division of the EEOC conducted an investigation twice or more a week during a period of at least two years. The evidence gathered was then submitted to a special staff in Washington, D.C. to evaluate. Ultimately all of the complaints were rejected by the EEOC which found that there was no reasonable cause to believe that the charges were true and the evidence on this trial amply sustains that conclusion.

### Sidney Murray

Mr. Murray has not been discriminated against during his employment with the Port Authority. He received all general salary adjustments from the date of his employment in 1968 to the present, as well as his annual merit increases for each of those years. He admitted in his deposition that he was not discriminated against with respect to either the general salary adjustments or merit increases. He further admitted that the performance evaluations in no way discriminated against him on the basis of his race. He made no claim regarding any testing procedures occurring after 1972. His only claim is that he should have been promoted sooner than the promotion he received in March 1981 from E–4 to Level E–5. With respect to this claim in regard to promotions the defendant has shown that the promotions given to others during the years plaintiff worked in the Design Division were based on fair and neutral employment and personnel decisions. Plaintiff made no reference to any specific job that he was qualified for that was given to a non-minority candidate. Murray's failure to receive an earlier promotion was instead the result of the contraction of the Design Division. In addition, Murray turned down an opportunity to transfer to a job in another division that might have provided greater advancement possibilities.

### George Robinson

Mr. George Robinson has not been discriminated against by the defendants with respect to pay, testing, supervisory evaluations, promotions, transfers, job assignments, discipline or other terms and conditions of employment because of his race and was given all general increases and all merit increases for which he was eligible as a Port Authority employee from 1968 through the present. He received an annual general merit increase each year it was authorized by the Port Authority from the commencement of his employment. He was given merit increases on the anniversary date of

his employment each year from 1968 to the present with the exception of 1974, 1978, 1979, 1980 and 1981 when he was at the top of his salary range or level and could not receive additional merit increases. In addition, in 1974, he received a promotion which resulted in a salary increase. The merit increases given to him were substantially the same as those given to white employees and there has been a consistently equitable application of merit increases between black and white employees in the Design Division at all relevant times.

On one occasion Mr. Robinson claims to have received a merit increase which brought him to a salary level approximately $250 below the maximum salary that could possibly be paid to an employee in his position; he was given a satisfactory merit increase based on his performance at that time, which was comparable to that of white employees and in fact all other employees with similar performance evaluations. Mr. Robinson received what could be characterized as the standard or usual merit increase given an employee doing satisfactory work and he was not in any way discriminated against because he did not receive an exceptional or unusual merit increase at the time in question.

As to promotions, Mr. Robinson was promoted from Architectural Draftsman III, Level B–3 to Associate Architect, Level B–4, on September 16, 1974. The promotions given to others during the years he was employed in the Design Division were based on fair and neutral employment and personnel decisions. Thus, one of the jobs that Mr. Robinson claimed should have been given to him was instead given to a more qualified individual, a registered architect. A second job that Mr. Robinson asserted he should have received was filled by a black male, although this individual was eventually reassigned. Regarding other jobs that Mr. Robinson specified, he was not qualified for them when they were opened or the jobs were filled by more qualified individuals.

With respect to those jobs sought by Mr. Robinson outside the Division, the persons chosen had qualifications equal to or better than Mr. Robinson's and the decisions to hire someone other than Mr. Robinson were based upon discretion to choose among equally qualified candidates and the final decisions as to the person selected were not based upon race. One job outside the Design Division that Mr. Robinson applied for was filled by a minority employee, a Hispanic female, whose qualifications exceeded Robinson's.

Mr. Robinson was not discriminated against with respect to his 1980 and 1981 performance evaluations. The 1980 performance evaluation was in fact a satisfactory evaluation, even though the comments portion contained an error with respect to the time period referred to. This "error" was not the result of any discriminatory act or motivated by any discriminatory acts or intent. The comments referred to in that evaluation were in fact laudatory of the plaintiff's performance. With respect to the 1981 evaluation, the comments contained therein were in fact accurate and characterizations, if any, of Mr. Robinson's performance on the particular jobs or projects referred to were admittedly accurate. These comments on his performance did not in any way discriminate against him.

Mr. Robinson received tuition reimbursement from the Port Authority during the course of his employment which paid his tuition costs for eight semesters of schooling while he was going for both his B.A. degree and M.A. degree. These tuition reimbursements were given to Mr. Robinson on each and every occasion he applied for them. In addition, on the three occasions Mr. Robinson applied for Middle Management Evaluation, twice in 1968 and once in 1971, he was permitted to participate in those evaluations and successfully completed the evaluations on each occasion. He successfully completed the Middle Management Evaluation, Technical Sub-section, in 1971 with a "full pass" and successfully completed the Design and Planning Subsections of the 1968 Middle Management Evaluation in the Reserve category.

With respect to the bonuses or incentive awards given to individuals in the Design Division between 1971 and 1981, on each and every occasion the recipients were given such awards as a result of their exemplary and meritorious performance. Those incentives were based upon discretion to choose among equally qualified individuals and the final decision as to the person selected was not based upon race.

### Other Defendants

Port Authority Commissioners, Hellmuth, Ronan, Sagner, Schulman, Cullman and Wagner, who were sued in their official capacities, and Peter C. Goldmark, Jr., the Executive Director of the Port Authority, had no personal knowledge of the alleged acts of discrimination claimed by any plaintiff.

### Incorporation by Reference

The Agreed Findings of Ultimate Objective Fact which were entered in evidence on the trial are hereby incorporated herein as if fully set forth.

### Conclusion

Accordingly, each complaint and the claim of each of the plaintiffs herein is hereby dismissed on the merits, with costs.

The foregoing shall constitute the findings of fact and conclusions of law required by Rule 52(a) of the Federal Rules of Civil Procedure.

SO ORDERED.