**Diane M. RITZIE, Plaintiff,**

v.

**CITY UNIVERSITY OF NEW YORK; Tilden J. Lemelle, Associate Provost of the City University of New York at Hunter College; Hugh J. Scott, Dean, DPE City University of New York at Hunter College; Andrew Robinson, Chairman/Director, ASSP, City University of New York at Hunter College, Defendants.**

No. 83 Civ. 3516 (CSH).

United States District Court, S.D. New York.

Jan. 5, 1989.

Ramon A. Martinez, New York City, for plaintiff.

Robert Abrams, Atty. Gen. of State of N.Y., New York City (Robert L. Schonfeld, Martha O. Shoemaker, Asst. Attys. Gen., of counsel), for defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

At the times pertinent to this action, plaintiff Diane M. Ritzie was a non-tenured administrative employee of defendant City University of New York (CUNY). CUNY administers Hunter College. Individual defendants LeMelle, Scott, and Robinson held administrative positions at Hunter College, and, in accordance with their various positions in the academic hierarchy, supervised plaintiff.

Plaintiff complains of her treatment at the hands of CUNY and the individual defendants. Her claims appear in an amended complaint filed by leave of Chief Judge Brieant, to whom the case was originally assigned. The amended complaint alleges federal constitutional claims; violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; and state law contract and tort claims under principles of pendent jurisdiction. Following discovery supervised by Magistrate Bernikow, all defendants move for summary judgment dismissing the action. Plaintiff cross-moves for partial summary judgment.

### I

*The Amended Complaint*

Plaintiff's amended complaint, while replete with broad and conclusory allegations, sufficiently identifies (when read together with plaintiff's affidavit) the particular incidents of which plaintiff complains. The facts as alleged by plaintiff are these.

Plaintiff, a black female, was born in 1943. In 1971 she first obtained employment at Hunter College. From 1971 to 1979 she worked as yearly contract employee in the Department of Academic Skills/SEEK Program. In 1979 she received a three-year contract in that program, running from July 1, 1979 to June 30, 1982. Plaintiff had also achieved a M.S. degree in Library Science.

In June 1980, plaintiff applied to New York University for enrollment in its graduate school of education, looking towards a

Ph.D. degree in Higher Education Administration. Plaintiff avers in her affidavit, and defendants do not dispute, that this enrollment could not have been accomplished without the endorsement and recommendation of plaintiff's superiors, defendants LeMelle and Scott. Since July 1979, defendant LeMelle had been the Chairman of the Department of Academic Skills/SEEK Program. LeMelle was appointed Associate Provost of Hunter College effective February 1, 1981. He ceased directing the SEEK program on April 30, 1981, and was succeeded by defendant Robinson. Defendant Scott was at the pertinent times and remains the Dean of the Division of Programs in Education at Hunter.

According to the amended complaint, ¶ 4(d), plaintiff's "troubles first began" with an episode involving defendant LeMelle. In spring of 1980, according to plaintiff, LeMelle became embroiled in controversy with one Dr. Wallace Austin, an adjunct lecturer in the Research Unit of the SEEK Program, which plaintiff supervised. The controversy involved Austin's rate of hourly pay and the number of hours he worked. Plaintiff's charge, in substance, is that she refused LeMelle's demands that she falsify records and give false testimony in the union grievance proceedings involving Austin, thereby incurring LeMelle's animosity and threat that anyone who testified against him would be "blacklisted." Ritzie Affidavit at ¶ 12. The amended complaint alleges that "from that moment on, plaintiff became a woman marked for academic destruction, because she refused to submit to the wrong directives of her male superior officer."

The next incident identified by plaintiff's pleading and affidavit occurred in December 1980. The department had advertised for a research assistant, who would work under plaintiff. One Frankie B. Ramadar submitted a resume which favorably impressed plaintiff. She forwarded his resume to LeMelle's office. Thereafter plaintiff interviewed Ramadar and recommended him to LeMelle for the position. Ramadar was appointed. Plaintiff had to leave her duties for surgery, remained on sick leave for two months, and returned to her job on February 1, 1981.

Plaintiff alleges that whereas initially Ramadar worked effectively and they were on good terms, on her return from sick leave Ramadar began acting in an insubordinate and rebellious manner to plaintiff. The amended complaint alleges at ¶ 8 that Ramadar protested that he did not want to "take any order from a black female"; and when plaintiff complained on the matter to LeMelle and Scott, "they acted cold, insensitive, and indifferently."

The amended complaint alleges at ¶ 9 that in addition to "the harassment of Frankie B. Ramadar that almost drove plaintiff mad," her situation was exacerbated by the attitude of defendant Robinson, now in charge of the SEEK Program, who "adopted a hostile attitude towards plaintiff concentrating on alleged tardiness of the plaintiff to her work, amounting to harassment ..."

Ramadar surfaces again in an incident plaintiff alleges occurred in or about April 1981. Plaintiff alleges that an anonymous letter was circulated charging an improper personal relationship between LeMelle and his secretary. Plaintiff alleges that she was falsely accused of editing and circulating that letter; and subsequently, with having coerced Ramadar to write and circulate it. Defendant Scott conducted an administrative hearing into this incident. Plaintiff complains that the hearing was "a pretext" to dismiss her from her position; that she was not given due notice and opportunity to defend herself; that Scott refused to permit plaintiff to be represented by an attorney; and, at the end of the hearing, Scott threatened to "fire" plaintiff if he concluded that she was lying in the matter. Amended Complaint, ¶ 11.

Plaintiff next alleges that after the Scott hearing, plaintiff consulted an attorney, "to complain to him of the rotten situation against women employees in the College and that she was being the object of persecution and harassment by her male superiors ..." Amended Complaint, ¶ 12. In point of fact, an attorney, Mark O. Grater,

wrote a letter dated June 18, 1982 to President Shalala of Hunter College protesting against "a libelous memo to you from Mr. Ramadar dated June 16, 1982," stating that there was no truth to the claim that plaintiff had "caused a scandalous letter to be circulated throughout the institution regarding a certain University official," and expressing concern that "certain officials have resorted to subtle pressures and innuendo against Ms. Ritzie regarding the above." Copies of counsel's letter were sent to Scott and LeMelle.

The amended complaint alleges at ¶ 12 that in the wake of counsel's letter, LeMelle, Scott and Robinson berated and upbraided plaintiff "for having gone outside of the university to hire an attorney to represent her in her difficulties with the defendants"; Robinson is alleged to have told the plaintiff that "her career was finished and that she was through at Hunter College" for having done so.

The amended complaint goes on to charge Robinson with searching through plaintiff's personal papers and belongings at her desk during her absence, and that Robinson "seized, stole, and took away from her personal belongings a sheaf of research materials towards her Ph.D. degree ... " ¶ 13. The amended complaint further alleges that in October 1982 Ramadar, "in furtherance of his harassment" and "as a pawn of" LeMelle, filed a new complaint against plaintiff with the Professional Staff Congress (the union representing employees of plaintiff's status), falsely charging plaintiff with harassing Ramadar. Defendant Robinson is alleged to have told plaintiff that she could not attend that union hearing, to be held in Scott's office, "because she was a 'black female' and other remarks to that effect." Amended Complaint, ¶ 14.

Plaintiff next complains that on or about November 15, 1982, she attempted to use the computer system of the department to continue data that she had been working on, only to discover that the code number assigned to her office had been changed on Robinson's orders, rendering plaintiff's data and programs inaccessible to her on the computer. Thereafter, plaintiff alleges, on Robinson's orders, a new password was set up for Ramadar, who then had access to plaintiff's programs and data. Plaintiff alleges that this was "part of the persecutory campaign of the LeMelle–Scott–Robinson–Ramadar conspiracy to destroy plaintiff professionally." Amended Complaint, ¶ 15.

Plaintiff next complains of her transfer by the individual defendants to "clerical work in another department of the College in a disciplinary transfer, without notice, hearing or opportunity to defend herself." That action occurred on November 15, 1982. Amended Complaint, ¶ 16.

The final factual allegations appear in ¶¶ 17 and 18. It is there alleged that defendants abolished her prior position, redistributed her work, reassigned her staff to other units, and that Ramadar was fired by way non-reappointment. Throughout all these incidents, plaintiff concludes, defendants "showed a pattern of preference and deference to male employees," including Ramadar, while females in comparison with males are "disproportionately under represented in the upper ranks of faculty and over represented in the lower ranks" unless personally preferred by their male superiors. Plaintiff's factual allegations conclude: "Plaintiff was not so preferred and became persecuted on the job."

Out of these incidents, the amended complaint derives a variety of claims, asserted under ten separate counts. Subject matter jurisdiction in this court is alleged under 28 U.S.C. §§ 1331 and 1343; 42 U.S.C. §§ 1983 and 1985(3); Article 1, Section 10(1) of the Constitution; the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution; and Title VII. The complaint also alleges that the amount in controversy exceeds $10,000. If that is an effort to allege diversity jurisdiction under 28 U.S.C. § 1332 it is unavailing, since the amended complaint does not allege diverse citizenship of the parties.

The ten separate counts may be summarized as follows:

Count I alleges that LeMelle's actions in respect of the Austin hearing, and Robin-

son's excluding plaintiff from the Ramadar hearing, violated plaintiff's First Amendment right of freedom of speech; and that defendant's reactions to plaintiff's consulting counsel violated her constitutional right to petition the government for redress of wrongs.

Count II alleges the theft by Robinson of plaintiff's property in violation of the Fourth Amendment.

Count III alleges that the cutting off of plaintiff from access to the computer constituted "malicious mischief," a crime and a tort under the law of New York State.

Count IV charges that defendants' demotion constituted a "breach of covenant under the common law," and also violated Article 1, Section 10(1) of the Constitution, which provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts ..."

Count V charges that defendants' actions in respect of the administrative hearings concerning the Ramadar incident, and plaintiff's subsequent demotion, violated plaintiff's rights under the union contract, and also the due process provision of the Fourteenth Amendment.

Count VI charges defendants with conspiracy to deprive plaintiff of her civil and constitutional rights.

Count VII charges that defendants complained of plaintiff's tardiness, as well as that of other women, but did not lodge comparable complaints against tardy men, thereby violating the equal protection clause of the Fourteenth Amendment.

Count VIII charges defendants with harassment, constituting a criminal action and a civil wrong under state law.

Count IX is captioned "Violation of Equal Employment Opportunity Act." It then alleges in conclusory terms the adverse impact of defendants' actions upon plaintiff.

Count X charges defendants with sex discrimination. The claim is cast in the broadest terms. It alleges that defendant CUNY has already been "adjudicated of sex discrimination" in *Melani v. Board of Higher Education of City of New York,*

561 F.Supp. 769 (S.D.N.Y.1983); and concludes with the allegation that the purpose of the individual defendants "was to make an example of the plaintiff and so dominate the female employees through terroristic discipline, intimidation, and fear."

The amended complaint seeks compensatory and punitive damages, as well as equitable relief restoring her to her prior position, and enjoining defendants from retaliating against plaintiff or any of her witnesses.

## II

■ Defendants contend that a number of plaintiff's claims are subject to dismissal as a matter of law. Plaintiff's opposing papers are critical of such contentions within the context of a motion for summary judgment; but there is no basis for that procedural criticism. To establish certain of their contentions, defendants were required to introduce matters outside the pleadings. Their motion was accordingly required to be presented as one for summary judgment under Rule 56, F.R.Civ.P. *See* Rule 12(b), last sentence. But there is no procedural objection, and no prejudice to plaintiff, in defendants' combining with a Rule 56 motion contentions that certain aspects of plaintiff's claims fail as a matter of law. Defendants are correct in certain of those contentions, which I deal with in this Part of the opinion.

### *The Eleventh Amendment*

■ Defendants contend that, with the exception of claims properly lodged under Title VII, the Eleventh Amendment bars plaintiff's claims.

That contention is correct. The New York statutory scheme requires that any money judgments entered against these defendants come from the state treasury. Defendants summarize the pertinent statutes in their main brief at 7–12, and plaintiff does not dispute the analysis. Absent explicit waiver by the state of its immunity, which is not found, plaintiff cannot recover money damages on her constitutional due process, equal protection, and contract

claims from these defendants. The more recent Supreme Court decisions on point include *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); and *Ford Motor Co. v. Department of the Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945).

Plaintiff responds on this point with broadly phrased references to the Fourteenth Amendment and its legal and social history. But that is not a sufficient response. In *Edelman, supra,* the Court barred under the Eleventh Amendment the award of retroactive benefits on a claim against state officials rooted in a constitutional equal protection claim. The Eleventh Amendment bar is circumvented only when, pursuant to that authority granted by § 5 of the Fourteenth Amendment, Congress "by appropriate legislation" enforces the Fourteenth Amendment's substantive provisions. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (holding that 1972 amendments to Title VII authorized money damage awards for individuals against state governments in discrimination cases). It is this holding in *Fitzpatrick* that permits the present plaintiff's monetary claims under Title VII to survive the Eleventh Amendment bar. The merits of those claims are discussed under Part III, *infra.* But plaintiff's constitutional claims, to the extent they are pleaded independently of Title VII, are barred by the Eleventh Amendment.

That bar exists not only to monetary damages, but also to plaintiff's effort to obtain an order from this court directing defendants to conform their conduct to state law, as plaintiff construes it. *See Almendral v. New York State Office of Mental Health,* 743 F.2d 963, 968–69 (2d Cir.1984), citing and quoting *Pennhurst, supra.*

### Impairment of Contract Claim

Quite apart from Eleventh Amendment considerations, plaintiff's claim that defendants impaired contractual obligations, in violation of Article 1, Section 10 of the Constitution, is not viable as a matter of law.

I may not reach the merits of plaintiff's constitutional contract claim because the provision of the Constitution she relies upon does not apply to defendants' conduct. Accordingly the court lacks subject-matter jurisdiction.

 That constitutional provision places limitations upon the ability of the states to enact laws. Plaintiff argues without citation to authority that "what is prohibited to a state by legislation, is also prohibited by administrative action." Amended Complaint, Count IV. It is true that the ambit of the Contract Clause is not limited to statutes enacted by the legislature. The clause also extends to municipal legislation which is passed under supposed legislative authority from the state. *Northern Pacific Railway Company v. State of Minnesota ex rel. City of Duluth,* 208 U.S. 583, 590, 28 S.Ct. 341, 343, 52 L.Ed. 630 (1908). However, a municipal ordinance, not passed under supposed legislative authority, cannot be regarded as a law of the state within the Contract Clause. *Hamilton Gaslight and Coke Co. v. Hamilton City,* 146 U.S. 258, 13 S.Ct. 90, 36 L.Ed. 963 (1892). The distinction drawn by the Supreme Court in these cases demonstrates that the assertion of the present plaintiff is far too broad. In any event, she complains of breaches of contract by individual action, and not as the result of statute or ordinance. She does not state a claim under the Contract Clause of the Constitution.

### The Conspiracy Claim

 In charging defendants with conspiring to deprive her of constitutional and civil rights, plaintiff must rely for federal subject-matter jurisdiction upon 42 U.S.C. § 1985(3).

But plaintiff's claim fails as a matter of law, in the absence of allegation of participation by any external parties. In the case at bar, the institutional defendant is CUNY; the individual defendants are all employees of that entity. Judge Pollack

has held in comparable circumstances that § 1985(3) does not apply "since the conspiracy requirement is not met by a conspiracy within a single corporate entity." *Wintz v. Port Authority of New York and New Jersey,* 551 F.Supp. 1323, 1325 (S.D.N.Y. 1982). *Wintz* involved a discrimination claim by nine engineers against the Port Authority, its commissioners and directors. Judge Pollack followed *Girard v. 94th Street and Fifth Avenue Corporation,* 530 F.2d 66 (2d Cir.1976), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976). Subsequent Second Circuit authority is in accord. *See, e.g., Herrmann v. Moore,* 576 F.2d 453, 457 (2d Cir.), *cert. denied,* 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978) (discrimination suit by tenured professor against law school, its dean, and faculty members); *Gilliard v. New York Public Library,* 597 F.Supp. 1069, 1075 (S.D.N.Y.1984) (discrimination suit against public library and certain of its individual officers and employees). Plaintiff at bar cites no contrary authority. Her § 1985(3) conspiracy claim fails for lack of a vital element.

### III

■ Plaintiff's Title VII claims remain. However, while they are broadly pleaded in the amended complaint, this court has subject-matter jurisdiction over Title VII claims only to the extent that they were originally asserted before the Equal Employment Opportunity Commission (EEOC), or the analogous state agency, here the New York State Division of Human Rights (NYSDHR). The statutory scheme requires that individuals claiming discrimination first assert those claims at the agency level. The district courts have jurisdiction in subsequent litigation only over such claims, or an employer's acts reasonably related to them. *Miller v. International Telephone & Telegraph Corp.,* 755 F.2d 20 (2d Cir.), *cert. denied* 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122, *rehearing denied,* 474 U.S. 1015, 106 S.Ct. 552, 88 L.Ed. 2d 479 (1985); *Almendral v. New York State Office of Mental Health,* 743 F.2d 963 (2d Cir.1984).

■ In the case at bar, plaintiff filed one complaint before the State Division of Human Rights. That claim, filed in April 1983, read in its entirety as follows:

Respondent has relentlessly pursued a policy of segregating complainant from the employment functions of one Frankie Ramadar, whom respondent has determined cannot work with "black women". Mr. Ramadar is and has been employed by respondent as a research assistant at the above-referenced place of employment. For approximately three months prior to October 18, 1982, respondent carried out the aforesaid policy and thereby frustrated complainant in the proper performance of her duties and the supervision of Mr. Ramadar. On October 18, 1982 respondent refused complainant permission to defend herself against a grievance brought against her by Mr. Ramadar, for the reason stated above. Respondent has at all times shown favoritism toward said employee, to the detriment of complainant.

In the spaces on the form preceding this statement, plaintiff specified the causes of the claimed discrimination as race, color, and sex. Where the form required her to state the date on which the "most recent or continuing discrimination took place," she responded: "October 18, 1982; on or above November 2, 1982."

Thus plaintiff's claim to the NYSDHR, which mirrored her charge to the EEOC, was discrete, and limited to the Ramadar incident, including the grievance procedures which Ramadar's complaint against her generated. Plaintiff nowhere asserted in her agency claim a continuing violation extending beyond that incident. In particular, she made no mention of the November 15, 1982 job action (which she characterizes as a "demotion," and defendants characterize in their motion papers as a "transfer"). On the contrary, the last date of discriminatory action specified by the plaintiff in her NYSDHR/EEOC complaint is November 2, 1982, and that in a claim filed in April 1983.

Accordingly, under the cases cited, this court is not seized of jurisdiction to consid-

er events other than the Ramadar incident referred to in the administrative claim. *Miller, supra,* at 25 (while that case involves alleged age discrimination, the same procedural principles apply). *Almendral, supra,* stands in contrast; the race discrimination claimant there included in her EEOC complaint an allegation that the acts of discrimination were on a "continuing" basis; and the defendants' alleged subsequent acts were "essentially the same as the earlier allegedly wrongful conduct contained in the EEOC complaint," namely discrimination in failing to appoint the claimant to a particular position. 743 F.2d at 967. It was for these reasons that the subsequent acts referred to in the district court complaint in *Almendral* survived as "reasonably related" to the EEOC complaint. That cannot be said of the present plaintiff's claim for alleged discriminatory demotion on November 15, 1982.

■ Thus limited, it is questionable whether plaintiff has alleged a *prima facie* showing of discrimination. Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ..." 42 U.S.C. § 2000e–2. Plaintiff has the initial burden of alleging that she was in a protected group; acts of the employer disadvantaging the employee; and disparate treatment by the employer of comparably qualified or situated persons of different races or sexes.

Plaintiff satisfies the first element. However, the first statement consistent with discrimination pleaded in the complaint is that of plaintiff's subordinate Ramadar, who is alleged to have said that he did not want to "take any orders from a black female." Amended Complaint at ¶ 8. The individual defendants are charged only with not responding forcefully to plaintiff's complaints about Ramadar; but the pleading does go on in ¶ 14 to allege that defendant Scott refused to permit a union hearing

generated by the Ramadar incident because she was "a black female."

Ramadar's racial remarks are not binding on any defendant, institutional or individual. Plaintiff infers from her own superiors' allegedly indifferent reaction to her complaints about Ramadar that Ramadar was the "agent provocateur" in discriminatory harassment of her, based on sex or race. The inference is conclusory, speculative and strained.

However, assuming *arguendo* that plaintiff makes out a *prima facie* discrimination claim in this regard, the defendants' affidavits on summary judgment articulate non-invidious acts quite at odds with the discrimination claim.

Defendant Robinson's affidavit acknowledges his awareness that plaintiff and Ramadar did not get along with each other. However, he states that plaintiff never filed a complaint against Ramadar with respect to sexual harassment. And Robinson attaches to his affidavit as Ex. E a memorandum dated October 13, 1982 which he addressed to Ramadar, strongly supporting plaintiff in respect of a complaint Ramadar had made against her, and reprimanding Ramadar. Thus Robinson wrote to Ramadar in part: "If my understanding of what transpired is accurate, I fail to find anything to suggest that Ms. Ritzie acted inappropriately nor does her actions in my opinion appear to have been a form of harassment."

Defendant Scott, who conducted the hearing of which plaintiff complains, states in his affidavit that following Ramadar's suggestion that plaintiff had circulated the letter about LeMelle and his secretary, he met with both plaintiff and Ramadar, told Ramadar the burden of proof fell on him, and explained to plaintiff that no charges had been filed against her. Scott adds that since Ramadar never came forward with any evidence, no charges involving the incident were ever filed against plaintiff by any of the defendants. As to the meeting plaintiff refers to, Scott says in his affidavit that this was an informal meeting with Ramadar and union representatives to ascertain what the union's position was,

since there were allegations made by one union member against another. Scott avers that plaintiff's sex and race had nothing to do with the admitted fact that she was not present at the meeting; and his articulated reason why she was not present is entirely plausible. Lastly, the record reflects that Ramadar was ultimately denied re-appointment by the College.

Confronted with these legitimate non-discriminatory reasons for the alleged mistreatment, it became plaintiff's duty to demonstrate that the employer's proffered reasons for its conduct were pretextual. *See, e.g., DeCintio v. Westchester County Medical Center,* 821 F.2d 111, 115 (2d Cir. 1987). Plaintiff's responsive papers are limited to speculation and conjecture. They do not contain that admissible evidence necessary to resist summary judgment. Cf. *Grant v. Pfizer Inc.,* 683 F.Supp. 41 (S.D.N.Y.1988) (summary judgment granted in employment discrimination case).

The same result would obtain, even if I were to regard myself as free to consider the November 15, 1982 job action of which plaintiff complains. The defendants' affidavits demonstrate that plaintiff was transferred from her position in the SEEK Program to a position in the Hunter College Library on the grounds of plaintiff's persistent tardiness and insubordination. Robinson's affidavit is supported with a series of contemporaneous pretransfer memoranda to plaintiff, recording her tardiness and warning against repetition. Plaintiff's persistent lateness was particularly aggravating to defendants, since she held a supervisory position, and her conduct affected others. Plaintiff argues that male employees were not disciplined for tardiness; but Robinson's affidavit, attaching as exhibits tardiness reprimands he also sent to a male employee, one Robert Bowns, demonstrates to the contrary. Plaintiff complains that she was transferred and Bowns was not; but Robinson's affidavit demonstrates that Bowns held a tenured faculty position, whereas plaintiff did not. This limited the College's options in disciplining Bowns.

The Robinson reply affidavit also deals with the circumstances under which Dr. Richard Fox, a white male, was hired by the Department of Academic Skills after plaintiff was transferred from that Department. Robinson's affidavit shows that Fox was not hired to take plaintiff's position. That position had been abolished during the course of a reorganization of the Department of Academic Skills, with the registrar function within the Department being eliminated and a new research unit within the Department being formed. Fox was hired as a research associate to head that new research unit. He held a Ph.D. in Educational Psychology, and was otherwise considerably more qualified than plaintiff.

Again, there is nothing in plaintiff's responsive papers to suggest the existence of admissible proof that these legitimate, noninvidious reasons are pretextual.

Similar considerations apply to plaintiff's claim of theft of property. Defendants' papers include an excerpt from plaintiff's deposition where she acknowledges the documents in question belonged to the College and had been made available to her.

It remains only to consider whether summary judgment is appropriate.

Rule 56 practice requires the party moving for summary judgment to support the motion by affidavits made on personal knowledge, setting forth facts which are admissible in evidence. When the motion is thus supported, the adverse party "may not rest upon the mere allegations or denials of his pleading"; his response, by affidavit or otherwise, "must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Rule 56(e). Summary judgment is appropriate if the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c).

On a motion for summary judgment, the court focuses upon "whether there is a need for a trial—whether, in other words, there are any genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The governing standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Ibid.* The inquiry posed by *Anderson* is "[w]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. at 2512. *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (Rule 56 is intended to implement the rights of litigants to demonstrate prior to trial that claims "have no factual basis"). While the party resisting summary judgment is to be given the benefit of all reasonable doubt in determining whether a genuine issue of material fact exists, mere conjecture or speculation does not provide a basis upon which to deny the motion; and the adverse party must do more than simply show that there is some metaphysical doubt as to the material facts. *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 41–42 (2d Cir.1986), citing *Matushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

These general principles apply to discrimination cases. In *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), the Second Circuit affirmed the district court's grant of summary judgment to a defendant in a Title VII case. Judge Kaufman wrote for the court of appeals that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." He added: "To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." *Ibid. See also Grant v. Pfizer, Inc., supra* (granting defendant summary judgment in Title VII case); *cf. Krulik v. Board of Education of City of New York*, 781 F.2d 15 (2d Cir.1986) (affirming district court's granting of defendant's motion for summary judgment n.o.v. under Rule 50(b) following verdict for plaintiff in Title VII case).

In the case at bar, defendants' motion for summary judgment is properly supported by affidavits by individuals competent to testify to specific facts, accompanied by contemporaneous documents which would be admissable in evidence. Plaintiff's response is conclusory and speculative. Given the governing principles of law, and this factual record, defendants are entitled to summary judgment dismissing all claims against them. Plaintiff's cross-motion for summary judgment must be denied. The parties' briefs raise other issues, but in the view I take of the case I need not consider them.[1]

---

1. Plaintiff's pleadings and brief indicate considerable reliance upon *Melani v. Board of Higher Education of City of New York*, 561 F.Supp. 769 (S.D.N.Y.1983). That was a Title VII class action against the Board of Trustees of CUNY, alleging sex discrimination in the Board's employment practices. Judge Gagliardi, who tried the case, characterized salary discrimination as "the focal point of this controversy," 561 F.Supp. at 772. He concluded that the defendant had discriminated against plaintiffs "in the payment of salaries in violation of Title VII." *Id.* at 783. The defendant Board, preserving its right to appeal, thereupon entered into settlement negotiations which produced a final consent decree which Judge Gagliardi endorsed. The consent decree was limited to salary discrimination, and provided that it did not consti-

tute an adjudication or finding on the merits of the case, nor an admission by defendant of a violation of Title VII or other statute.

Plaintiff at bar alleges that she was a member of the *Melani* class, which Judge Gagliardi certified as comprising "all women now employed by the Board as members of the professional instructional staff at CUNY, or who at anytime since October 1968 have been so employed or have sought such employment." 561 F.Supp at 772. The present defendants do not dispute that status. But *Melani* furnishes no support to plaintiff in the case at bar. *Melani* was limited to salary discrimination. In the case at bar, it is common ground that plaintiff's transfer to the College Library staff involved no change in salary or administrative rank. Furthermore, plain-

## IV

As noted in the analysis of the amended complaint, plaintiff asserts a number of pendent state law claims against defendants. Given the resolution of the federal claims, the state law claims will be dismissed without prejudice. *Almendral v. New York State Office of Mental Health, supra,* at 968–67, and cases cited.

## V

Defendants' motion for summary judgment dismissing plaintiff's federal claims is granted. They will be dismissed with prejudice. Plaintiff's cross-motion for summary judgment is denied. Plaintiff's pendant state claims will be dismissed without prejudice.

The Clerk is directed to enter judgment accordingly. SO ORDERED.

tiff asserted no salary claim before the NYSDHR/EEOC; nor is a specific salary claim

asserted in the amended complaint.