**Morris SILVER, Plaintiff,**

**v.**

**The CITY UNIVERSITY OF NEW YORK, The Board of Trustees of the City University of New York, Bernard W. Harleston, Joseph S. Murphy and James P. Murphy, Defendants.**

**No. 90 Civ. 0061 (KTD).**

United States District Court, S.D. New York.

April 22, 1991.

MEMORANDUM AND ORDER

KEVIN THOMAS DUFFY, District Judge.

Plaintiff Morris Silver is a Professor of Economics. He brings this employment discrimination action against defendants the City University of New York ("CUNY"), its Board of Trustees, Bernard W. Harleston, Joseph S. Murphy and James P. Murphy, claiming violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. § 1983. The parties cross-move pursuant to Fed.R. Civ.P. 56(c) for summary judgment.

## FACTS

Silver has taught at the City College of the CUNY system[1] since 1961 and has served as chair of the Economics Department since 1969. Silver's Deposition ("Depo.") at 7. Published widely, Silver has concentrated his academic efforts in the area of historical economics. Silver Depo. at 6–7.

CUNY recognizes, and chooses academicians for, a certain honor known as a Distinguished Professorship.[2] As delineated in the City University By–Laws, a Distinguished Professorship is reserved for a small number of truly extraordinary scholars. The applicant must be a Full Professor and "a person of outstanding merit and accomplishment in his/her field." The honor carries a stipend of $20,000 above the normal salary and this distinction is reserved for no more than 125 of the approximately 2,300 full professors on CUNY's faculty. Bloom Affid. ¶¶ 4, 5. Sometime in early 1987, Silver mentioned to members of the Economics Department's Executive Committee that he was interested in being considered for a Distinguished Professorship. Silver Depo. at 8–9. He submitted a statement expressing his interest and outlining his recent work. Silver Depo. at 8–9.

Morris Silver, pro se.

Robert Abrams, Atty. Gen., State of N.Y. (Clement J. Colucci, Asst. Atty. Gen., of counsel), New York City, for defendants.

1. Technically, CUNY is comprised of several city colleges in New York City and its boroughs. Silver is affiliated with CUNY's City College.

2. The Distinguished Professorship serves several functions. First, it honors faculty members for superlative achievements and contributions to the City University's intellectual life. Bloom Affid. ¶ 7. Second, it can be, and has been, used to recruit outstanding scholars from other institutions. Bloom Affid. ¶ 7. Third, it can be, and has been, used to retain outstanding City University faculty who are being wooed by other schools. Bloom Affid. ¶ 7. Accomplished minority and female faculty at the City University are choice targets for raiders from other schools, and some of the minority and female faculty members recently named Distinguished Professors were, at the time, actively pursued. Bloom Affid. ¶ 8.

Contemporaneously, CUNY began efforts to create an affirmative action policy in connection with and applicable to the selection of distinguished professors. Originating as a recommendation of the Committee on Academic Affairs to the University Council of Presidents, the policy was memorialized in the Committee's report, dated January 26, 1987. It suggested that future groups of candidates for the honor of Distinguished Professor "should include a very significant representation of minorities and females." Bloom Affidavit, Exh. C. The report further stated that out of the more than 25 vacant distinguished professor positions "no more than 5 may be inside appointments, except in very unusual circumstances." Exh. C, ¶ 8.

Subsequently, a memorandum regarding appointments for the distinction of Distinguished Professor was sent by the Acting Vice Chancellor for Academic Affairs to all college Presidents in the CUNY system on March 26, 1987. Because affirmative action was and is of the highest importance to CUNY schools, the memorandum stated that the group of nominees to be presented to the Board of Trustees is expected to include a very significant representation of minorities and females. City College President Bernard W. Harleston also sent a memorandum announcing CUNY's affirmative action policies to the City College Provost Charlene McDermott, on that same date. However, Silver professes that he had not then nor previously been aware of this affirmative action policy.

Nonetheless, after reviewing Silver's work and the opinions of scholars outside the City University, the Executive Committee unanimously recommended Silver's appointment as a Distinguished Professor on April 2, 1987. Silver Depo. at 9; Plaintiff's Memo at 4. Silver as well as other candidates were then considered by the Division of Social Sciences Personnel and Budget Committee. Silver Depo. at 10. That committee, composed of the chairs of all departments in the Division of Social Sciences, recommended the appointment of both Silver and Eleanor Leacock, a Professor of Anthropology. Silver Depo. at 9–10.

The next step was the City College Review Committee, which consists of all College Deans, the Chair of the Faculty Senate, and the Provost. Harleston Affid. ¶ 6. No recommendation was made on Silver's behalf at this stage, but assertedly, the committee did recommend the posthumous appointment of Professor Leacock, who had died before the Review Committee's vote. Silver Depo. at 10.

After Silver's nomination was rejected, he wrote a letter to Harleston, the College's president, informing him of a pending appeal. Harleston replied that Silver's appeal would be considered by the Faculty Committee on Personnel Matters. Silver Depo. at 10–11. On September 16, 1987, that Committee recommended that Harleston support Silver's recommendation as a Distinguished Professor. Harleston Affid. ¶ 7. Harleston, however, refused to forward Silver's nomination to the Chancellor, stating that the decision reflected his best academic judgment. Harleston Affid. ¶ 8 and Exh. C. Subsequently, Silver filed a grievance pursuant to CUNY's collective bargaining agreement with the Professional Staff Congress, the union representing CUNY faculty. A grievance hearing was then conducted. Silver Depo. at 17–18.

On May 6, 1987, McDermott distributed copies of the March 26th memorandum, outlining CUNY's affirmative action policy, at the City College Review Committee meeting. Harleston ¶ 16. Silver was notified by letter dated May 14, 1987, that his name had not been forwarded for an award of Distinguished Professor by the Review Committee. Harleston Affid., Exh. A. Additionally, Silver's grievance proceedings proved unsuccessful. Silver Depo. at 24–28. Silver then pursued a claim before the Equal Employment Opportunity Commission ("EEOC"), which ultimately found no violation of his rights. Silver Depo. at 4A–5A. At present, 68 of the 87 of CUNY's Distinguished Professor seats are filled by white males. Defendant's 3(g) ¶ 15.

## DISCUSSION

Silver, a white male, and an unsuccessful candidate for the position of Distinguished Professor alleges that he failed to win that

honor because he is a victim of CUNY's policy of reverse discrimination against white male candidates, especially those who are already on the CUNY faculty.

■ Title VII is limitless in its scope to protect all individuals, regardless of race. It broadly prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). "Similarly, the EEOC, whose interpretations are entitled to great deference, has consistently interpreted Title VII to proscribe racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites." *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 279, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976). Thus, Silver has a perfectly viable claim if he can satisfy certain requisite burdens. In actions brought under Title VII, the plaintiff bears the burden of initially proving a prima facie case. *Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir.1991) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). Proof of discriminatory motive is critical. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *accord Zahorik v. Cornell University*, 729 F.2d 85 (2d Cir.1984). In order to carry the initial burden a plaintiff must show:

> (i) that he belongs to a [protected group]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (footnote omitted).

Thus, Silver must show that he was a member of a protected group, was qualified for the position sought, and was denied it in circumstances permitting an inference of discrimination. *Zahorik v. Cornell University*, 729 F.2d 85, 92 (2d Cir. 1984). Pursuant to Title VII, Silver is obviously a member of a protected class in the disparate treatment and reverse discrimination arena. CUNY admits that Silver was qualified for the position of Distinguished Professor, but maintains that a question of fact is raised as to whether he was the most amply qualified faculty member at the time that he sought nomination. Finally, there is a dispute that Silver was denied the honor under circumstances permitting an inference of discrimination.

■ Assuming *arguendo* that there exists sufficient evidence to create a triable issue of fact as to a prima facie case, then there is a shift in the burden of persuasion and defendants must then articulate either a legitimate, nondiscriminatory reason why the "plaintiff was rejected, or [that] someone else was preferred, for a legitimate, nondiscriminatory reason." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). In order to carry that burden, the evidence must show more than a mere disagreement about the merits of a candidate's scholarship:

> Absent evidence sufficient to support a finding that such disagreements or doubt are influenced by forbidden considerations such as sex or race, universities are free to set their own required levels of academic potential and achievement and to act upon the good faith judgments of their departmental faculties or reviewing authorities.

*Zahorik v. Cornell University*, 729 F.2d 85, 94 (2d Cir.1984).

Regarding the choice not to nominate Silver, the City College's president states that "reasonable persons could disagree with particular choices, whether mine or the City University's, but I have always used my best academic judgment in choosing whom to recommend to the Board of Trustees." Harleston Affid. ¶ 10. CUNY's policy for choosing Distinguished Professor candidates requires a diligent search for minority and female applicants.

Once such candidates are identified, "they must be judged on merit." Harleston Affid. ¶ 12. Harleston claims he has never been known to choose a less qualified minority to fill a position in lieu of a more qualified white male applicant, and he further claims that "[i]f, in my judgment, qualified white, male candidates exist alongside qualified minority or female candidates, I can and do nominate them as well." Harleston Affid. ¶ 12.

In light of the record before me, I find Harleston's rationale to be without discriminatory motive. Indeed, since CUNY's minority policy went into effect, Harleston made ten Distinguished Professor nominations, five of whom were white males and five minorities and/or women. Harleston Affid. ¶ 13. Thus, a legitimate, nondiscriminatory reason for not appointing Silver as a CUNY Distinguished Professor is sufficiently articulated. Neither does Silver challenge CUNY's minority policies as per se illegal.

Of course I recognize that employment discrimination, although invidious, is subtly accomplished. "An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to discrimination." *Cf. Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir.1991) (citing *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir.1990)). As an alternative to objective information, a purported victim of discrimination must rely on "the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d at 533. Here, Silver mainly relies on statistical evidence, bolstered only by nominal anecdotal evidence. CUNY maintains that neither creates a triable issue of fact. I agree.

■■■ "[T]he ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff at all times." *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 997, 108 S.Ct. 2777, 2790, 101 L.Ed.2d 827 (1988). Statistical evidence alone, in the absence of anything more, cannot ordinarily establish a prima facie case under Title VII. *Martin v. Citibank, N.A.*, 762 F.2d 212, 218 (2d Cir.1985). Only gross statistical disparities can establish a prima facie case of discrimination. *See New York City Transit Authority v. Beazer*, 440 U.S. 568, 584, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979) (prima facie violations of Title VII may be established by statistical data reflecting employment practices which creates the essential effect of denying members of one race equal access to employment or promotion opportunities); *accord Hazelwood School Dist. v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977). Thus, plaintiff's burden in establishing a prima facie case goes beyond the need to show mere statistical variance. Specific employment practices must be the subject of challenge, "[e]specially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests." *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 656, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989) (citation omitted). In this case, nominations are based not only on objective academic achievement, but on other subjective criteria as well.

■■■ The purpose of statistical evidence in employment discrimination cases is to analyze differences between actual employment data and projections of what would exist in the absence of discrimination. *Kirkland v. New York State Dep't of Correctional Services*, 711 F.2d 1117 (2d Cir.1983), *cert. denied sub nom. Althiser v. New York State Dep't of Correctional Services*, 465 U.S. 1005, 104 S.Ct. 997, 79 L.Ed.2d 230 (1984). When differences between actual and projected values grow great enough, the likelihood that the difference is merely due to chance diminishes. Statistical analysis of the racial composition of an employer's work force is properly made by comparing "the racial composition of the at-issue jobs and the racial composition of the qualified population in the relevant labor market." *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 656, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989). No such gross statistical disparity can be adduced from Silver's submissions.

Comparing the racial and sexual composition of the group of Distinguished Profes-

sors appointed before April 1987 with that of the group appointed after April 1987, Silver misapplies this test. "Prior to the application of the new policy 80.3 percent (45 of 56) of those appointed as Distinguished Professors were white males. After the new policy the percentage of white males declined to 75.0 percent (24 of 32)." Plaintiff's Memorandum at 14. This indicates only that there are more minority and female Distinguished Professors than there were in the past, which is neither surprising nor per se reverse-discriminatory. In general, it is fair to say that all previously white male dominated professions are slowly being integrated. CUNY is just changing with the times and integrating its lot of distinguished academicians. This can hardly be viewed as pretextual.

Silver's anecdotal evidence is equally unpersuasive. He merely alleges that CUNY's policy of searching for minorities and women to fill some of the Distinguished Professorships was prohibitively secretive and thus discriminatory. Allegations of secrecy are belied by the open letter that Harleston wrote to the Provost regarding CUNY's policy. In turn, the Provost distributed copies to all City College deans and the Chair of the City College Faculty Senate. Harleston Affid. ¶ 16. All of this is inconsistent with a policy of secrecy and deception. Additionally, Silver avers that the Leacock nomination was somehow discriminatory because posthumous appointments are prohibited by the Board of Trustees, she died during the review process, and yet she was nominated for a posthumous appointment. However, upon learning that posthumous appointments were prohibited, Harleston withdrew Leacock's nomination. The attempt to appoint Leacock posthumously can be construed as a purely honorary and sentimental gesture and could have no effect on the prospects of living candidates.

Finally, since April of 1987, twenty four of the last thirty two appointments have been white males. Bloom Affid., Exh.A. Indeed, a majority of Harleston's nominations have been white males. Harleston Affid. ¶ 13. "[A]n employer's good faith efforts to achieve a nondiscriminatory work force, might in some cases assist an employer in rebutting the inference that particular action had been intentionally discriminatory." *Connecticut v. Teal*, 457 U.S. 440, 454, 102 S.Ct. 2525, 2534, 73 L.Ed.2d 130 (1982); *see also Meiri v. Dacon*, 759 F.2d 989, 996–97 (1985) (defendants burden of production is satisfied if the factual issues adduced in its support are framed with sufficient clarity and specificity to rebut a presumption of pretext). Here, CUNY's policy does not require or permit quotas, or the use of different or lower standards in judging minority and female candidates for Distinguished Professorships. Bloom Affid. ¶¶ 14, 16. Rather, the policy urges that special efforts be taken to identify promising minority and female candidates. Once they are identified, they are judged by the same rigorous standards applied to white males. Bloom Affid. ¶ 16. Thus, CUNY adduces sufficient facts to overcome the presumption of pretext at bar. Should I hold in favor of Silver on the instant facts as adduced by him, I fear a chilling effect would pervade CUNY's halls for future minority and female appointments. CUNY is merely seeking to equalize its generally homogeneous force of Distinguished Professors and I cannot fault them their efforts here.

■ Silver's claim under 42 U.S.C. § 1983 is based on exactly the same conduct as the Title VII claim and lists the same defendants. First, assuming that a § 1983 action can proceed against the individual defendants, CUNY is immune to suit under the Eleventh Amendment. *Ritzie v. City University of New York*, 703 F.Supp. 271 (S.D.N.Y.1989). As for the remaining defendants, "[i]nclusion of [a § 1983] claim does not increase the plaintiff's opportunity to prevail." *Wintz v. Port Authority of New Jersey*, 551 F.Supp. 1323, 1325 (S.D.N.Y.1982); *see also Carrion v. Yeshiva University*, 535 F.2d 722 (2d Cir.1976). Whether a § 1983 action can survive for the same conduct as adduced to support the Title VII action is an unsettled question in this Circuit. *Carrero v. New York City Housing Authority*, 890 F.2d 569, 595 (2d Cir.1989). In this instance, there is nothing to be gained by allowing the § 1983 claim to

**500**

survive just because it was listed as an alternative to Title VII. No questions of material fact are adduced in this case sufficient to withstand motions for summary judgment.

For the foregoing reasons Silver's motion for summary judgment is denied, the defendants' cross-motion for summary judgment is granted and the complaint is dismissed in its entirety.

SO ORDERED.