**John G. CIANFRANO, Plaintiff,**

v.

**Bruce BABBITT, Director of U.S. Department of Interior, Defendant.**

No. 88–CV–1238.

United States District Court, N.D. New York.

April 28, 1994.

John G. Cianfrano, pro se.

Gary L. Sharpe, U.S. Atty., N.D.N.Y., for defendant; Paula Ryan Conan, Asst. U.S. Atty., Syracuse, NY, of counsel.

### MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–1 to 2000e–17 (1988 & West Supp.1994). Plaintiff alleges that he was dismissed from his position as an employee of defendant as a

result of racial discrimination. Currently before the court is defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. At the request of the parties, the court took the motion on submission. The following constitutes the court's disposition of this motion.

## I. BACKGROUND

Plaintiff pro se filed this action on November 23, 1988, alleging that defendant Bruce Babbitt, in his capacity as Secretary of the United States Department of Interior,[1] violated his civil rights. More specifically, plaintiff claims to have been released from his employment at Fort Stanwix National Monument ("FOST"), in Rome, New York, for reasons made unlawful by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–1 to 2000e–17.[2] See Amended Complaint, Document ("Doc.") 5. Plaintiff, a white male, charges that his immediate supervisors at FOST discriminated against him because of his race. Those supervisors were Robert Guellich, a white male who served as Chief of the FOST Maintenance Department, and William N. Jackson, a black male who served as Superintendent of FOST.

Plaintiff was hired to work at FOST by Robert Guellich, in May 1984. Jackson Affidavit, attached to Doc. 13, at ¶ 5. Originally designated a seasonable laborer in the Maintenance Department, and a WG–1 wage earner, plaintiff soon became a full-time "TAPER" employee. Collins Affidavit, attached to 13, at ¶ 8. TAPER is an acronym representing "temporary appointment pending establishment of a register," which is a federal employment category defined in the Federal Personnel Manual Regulations in Chapter 316, Subchapter 4. See Regulations, attached to Doc. 13; See also 5 C.F.R. § 316.-201 (1994). As a TAPER employee, plaintiff was employed full-time on a seasonal basis, and was furloughed without pay from January through March of each year. Collins Affidavit, attached to Doc. 13, at ¶ 8.

While employed at FOST, plaintiff's supervisors reported that his work performance was satisfactory. In Performance Appraisal Forms utilized by NPS, William Jackson and Robert Guellich both attested that plaintiff's performance was at a minimum "fully successful" for each year between 1984 and 1987, inclusive. See Performance Appraisals, Defendant's Exhibit ("Def. Exh.") B, Doc. 14; Guellich Affidavit, attached to Doc. 13, at ¶ 4. Indeed, the quality of plaintiff's work apparently improved over his tenure at FOST.[3]

Pursuant to regulations set forth in the Federal Personnel Manual, plaintiff was due to be converted to permanent status on September 26, 1987. Collins Affidavit, attached to Doc. 13, at ¶ 8; Jackson Affidavit, attached to Doc. 13, at ¶ 13. Plaintiff, however, never achieved permanent status, as he was informed on August 24, 1987 that he was being "separated" from the National Park Service effective September 25, 1987. See Separation Notice, Def. Exh. H, Doc. 14. The separation notice, written by Superintendent Jackson, notified plaintiff that his termination was necessitated by continuing funding reductions at FOST. Id.

To compensate for the loss of plaintiff, who was FOST'S only full-time maintenance worker, Superintendent Jackson extended a part-time seasonal maintenance position through December 31, 1987. Jackson Affida-

---

1. The complaint originally named as defendant the Regional Director of the National Park Service ("NPS") rather than the Director of the NPS or the Secretary of the Interior. The court allowed plaintiff to amend his complaint to cure this defect. See Memorandum–Decision and Order dated August 12, 1989, Document ("Doc.") 4, at 5. Thus Herbert S. Cables, Jr., and later Manuel Lujan, were subsequently named as defendants by virtue of their successive terms in office as Secretary of the United States Department of the Interior. Finally, the court recognizes the substitution of Bruce Babbitt, the current Secretary of the Department of Interior, as the appropriate defendant at this juncture.

2. FOST is an historic park operated by the National Park Service, which is an agency of the United States Department of Interior.

3. Plaintiff's "Summary Ratings Points" increased steadily from 2.000 in 1984 to 2.89 in 1987, when his performance was determined to "exceed fully successful." Performance Appraisals, Def. Exh. B, Doc. 14. These ratings points represent the supervisors' evaluation of quality of work, at a variety of tasks, on a scale ranging from zero to four. Id.

vit, attached to Doc. 13, at ¶ 14. That position originally was scheduled to end September 31, 1987. *Id.* The WG–1 employee whose work at FOST was extended was William Timms, a black male. *Id.,* Guellich Affidavit, attached to Doc. 13, at ¶ 11. Plaintiff's former work was split between Timms and other employees at FOST. Plaintiff's position at FOST was eliminated, and he was not replaced.[4] Jackson Affidavit, attached to Doc. 13, at ¶ 19.

Plaintiff appealed his termination from employment with NPS to the United States Merit Systems Protection Board ("MSPB"). After a full hearing, an Administrative Law Judge ("ALJ") affirmed plaintiff's separation in an Initial Decision, holding that the separation was implemented for a permissible reason, as part of a valid Reduction In Force ("RIF"). *See* Initial Decision, Def. Exh. S, Doc. 14; Transcript of Hearing, Def. Exh. R, Doc. 14. The ALJ's Initial Decision was upheld by the full Board in July 1988, and thereafter by the Equal Employment Opportunity Commission ("EEOC") on October 19, 1988. *See* Initial Decision, Def. Exh. S, Doc. 14; EEOC Decision, Def. Exh. T, Doc. 14.

Plaintiff then filed a timely complaint in this court, alleging jurisdiction pursuant to Title VII. Plaintiff argues that he was discriminated against on the basis of race. Specifically, plaintiff avers that while he was released as a result of the RIF, a less qualified minority had his period of employment extended. Defendant counters that the RIF was an economic necessity brought about by several successive years of budget cuts mandated by the Gramm–Rudman–Hollings Act.

## II. DISCUSSION

### A. *Standards for Summary Judgment*

The principles this court must apply in analyzing defendant's motion for summary judgment are well established. Under Federal Rule of Civil Procedure 56(c) summary judgment shall enter if, when viewing the evidence in the light most favorable to the nonmovant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Eastman Kodak Co. v. Image Technical Servs., Inc.,* —— U.S. ——, ——, 112 S.Ct. 2072, 2077, 119 L.Ed.2d 265 (1992); *Commander Oil v. Advance Food Serv. Equip.,* 991 F.2d 49, 51 (2d Cir.1993). Where the moving party does not bear the ultimate burden of proof on an issue, that party satisfies its summary judgment burden by "point[ing] to the absence of evidence to support an essential element of the non-moving party's claim." *Brady v. Town of Colchester,* 863 F.2d 205, 211 (2d Cir.1988). Where the movant does shoulder the burden of proof, it must establish that there is no genuine issue of material fact to be decided regarding any element of that party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In either case, if the movant satisfies its initial summary judgment burden, then the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists. *Weg v. Macchiarola,* 995 F.2d 15, 18 (2d Cir.1993). To survive the motion for summary judgment the nonmovant must do more than present evidence that is merely colorable, conclusory, or speculative, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986), and furthermore must show more than "some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). In order to prevail, the nonmovant must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514.

In the context of a discrimination case, courts are typically reluctant to grant summary judgment. Because "employment discrimination is often accomplished by discreet manipulations," *Charrette v. S.M. Flickinger Co.,* 806 F.Supp. 1045, 1053 (N.D.N.Y.1992) (McCurn, C.J.), direct proof of wrongful be-

---

4. This reduced staffing level was maintained through 1991, when a new position for the FOST Maintenance Department was funded and filled by a new TAPER employee, a white male. Jackson Affidavit, attached to Doc. 13, at ¶ 19.

havior is seldom available to a victim of discrimination, who is therefore "usually constrained to rely on the cumulative weight of circumstantial evidence." *Id.,* at 1053–54 (quoting *Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir.1991)). Moreover, in assessing a claim of employment discrimination, the court necessarily must inquire into defendant's intent and state of mind. The Second Circuit has noted that summary judgment is "notoriously inappropriate" where an individual's intent and state or mind is at issue. *Leberman v. John Blair & Co.,* 880 F.2d 1555 (2d Cir.1989) (quoting *Pfizer, Inc. v. Int'l Rectifier Corp.,* 538 F.2d 180, 185 (8th Cir.1976), cert. denied, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977)); *see also Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985); *Patrick v. LeFevre,* 745 F.2d 153, 161 (2d Cir.1984). Since determining an individual's state of mind is possible only through reference to a wide range of subjective factors, and since reasonable people can disagree on the importance and relative weight to be assigned to these factors, the function of determining state of mind has traditionally been entrusted to the jury. *Patrick,* 745 F.2d at 159.

However, the Second Circuit has also expressed an unwillingness to allow "the mere incantation of intent or state of mind ... [to] operate as a talisman to defeat an otherwise valid [summary judgment] motion." *Meiri,* 759 F.2d at 998. Such an approach, the Circuit has noted, would render the summary judgment rule sterile in discrimination cases, where intent is inevitably at issue. *Id.* In fact, the Second Circuit has flatly stated that "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Id.* (citations omitted). Therefore the courts of this Circuit will not shrink from granting a motion for summary judgment where the non-movant's proof "amounts to no more than speculation and conjecture." *Resource Developers v. Statue of Liberty– Ellis Island Found.,* 926 F.2d 134, 141 (2d Cir.1991); *see also Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir.1989).

With these standards in mind, the court turns to the substance of defendant's motion for summary judgment. ,

At issue in this case is whether plaintiff was, as he claims, terminated for reasons violative of Title VII. Plaintiff argues that he was dismissed from the NPS due to impermissible motives involving racial animus. As stated in Title VII, it is "an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, term, conditions, or privileges of employment, because of such individual's race ..." 42 U.S.C. § 2000e– 2(a).

In analyzing claims under Title VII, the court applies the now-familiar test first enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). That test, recently further clarified in *St. Mary's Honor Center v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), assigns to plaintiff the ultimate burden of proving discriminatory intent on the part of defendant. However, in recognition of the practical difficulty of marshalling direct proof of discriminatory intent, the *McDonnell Douglas* test sets forth a burden-shifting scheme through which plaintiffs may prove intent indirectly.

The first phase of this scheme under *McDonnell Douglas* assigns to plaintiff "the burden of proving by a preponderance of the evidence a prima facie case of discrimination." *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824). The elements of a plaintiff's prima facie case vary from fact pattern to fact pattern. *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. In the instant case, in order for plaintiff to make out a prima facie case of discriminatory firing, he must show that: (1) he belongs to a protected class; (2) his job performance was satisfactory; (3) he was fired; and (4) the discharge occurred in circumstances giving rise to an inference of racial discrimination. *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1188 (2d Cir.1987); *Meiri,* at 995. If plaintiff

succeeds in establishing a prima facie case of discrimination, a presumption arises that defendant discriminated against him. *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747 (citing *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094).

Second, if such a presumption does arise, the burden shifts to defendant to produce evidence of a legitimate, nondiscriminatory reason for the employee's termination. *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Defendant "need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95. Further, defendant need not demonstrate that its motivation was sound, so long as that motivation was racially neutral. *Lieberman v. Gant,* 630 F.2d 60, 65 (2d Cir.1980).

Third, "should defendant carry this burden the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the reasons given by the defendant were not its true reasons but instead a pretext for discrimination." *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 464 (2d Cir.1989) (citing *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94). That is, if defendant satisfies its burden of production and thus successfully rebuts the presumption of intentional discrimination, the *McDonnell Douglas* framework becomes irrelevant. *Hicks,* —— U.S. at ——, ·——, 113 S.Ct. at 2747, 2749. The onus returns to plaintiff, who must establish by a preponderance of the evidence not only that the nondiscriminatory reasons cited by defendant are pretextual, *see Song v. Ives Laboratories,* 957 F.2d 1041, 1045 (2d Cir. 1992); *Rosen,* 928 F.2d at 532, but also that racial discrimination was the true reason why plaintiff was fired. *Hicks,* —— U.S. at ——, 113 S.Ct. at 2752. Plaintiff's burden of proving pretext thus merges with the overall burden of proving discrimination. *Id.,* 113 S.Ct. at 2749.

Applying the *McDonnell Douglas* framework, the court turns to its examination of plaintiff's claims.

### B. *McDonnell Douglas Analysis*

#### 1. *Plaintiff's Prima Facie Case*

■ As noted above, in order for a plaintiff to make out a prima facie case of discriminatory firing, he must show that: (1) he belongs to a protected class; (2) his job performance was satisfactory; (3) he was fired; and (4) the discharge occurred in circumstances giving rise to an inference of racial discrimination. *Lopez,* 831 F.2d at 1188; *Meiri,* 759 F.2d at 995. In the instant case, the fact that plaintiff was fired from his job is without question. Further, it is also apparent that plaintiff's job performance was satisfactory for the full period of his employment at FOST. Since plaintiff's work performance was judged "fully successful" by both Robert Guellich and William Jackson, it must be conceded by defendant that plaintiff's work performance was satisfactory. *See Meiri,* 759 F.2d at 995 ("the ultimate inquiry is whether an employee's performance 'meets his employer's legitimate expectations'") (quoting *Huhn v. Koehring Co.,* 718 F.2d 239, 244 (7th Cir.1983)). Thus, the elements of plaintiff's prima facie case upon which the court must focus its attention are the first and final elements.

■ In assessing the evidence applied to these elements, the court is mindful of the well-established rule that plaintiff's burden of establishing a prima facie case is not onerous. *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180 (2d Cir.1992) (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093). Indeed, the Second Circuit has characterized plaintiff's burden at the prima facie stage as *de minimis. Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988). The court finds that plaintiff has met these minimal standards, and has presented a prima facie case of discrimination for purposes of surviving defendant's motion for summary judgment.

As to the first prong, plaintiff's membership in a protected class, it is important to note that a plain reading of the statute reveals that the protection of Title VII extends to all individuals, regardless of race. *See* 42 U.S.C. § 2000e–2(a). In fact the EEOC, "whose opinions are entitled to great defer-

ence, has consistently interpreted Title VII to proscribe racial discrimination ... against whites on the same terms as racial discrimination against nonwhites." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 279, 96 S.Ct. 2574, 2578, 49 L.Ed.2d 493 (1976). Thus, plaintiff's status as a white man makes him a member of a protected class for the purpose of a reverse discrimination suit. *See Silver v. City University of New York*, 767 F.Supp. 494, 497 (S.D.N.Y. 1991).

To establish the final element of a discriminatory firing, plaintiff is required to establish that there are circumstances surrounding his termination of employment with FOST from which a trier of fact could infer discrimination. *See Lopez*, 831 F.2d at 1184. Plaintiff raises several points in this regard. First, he points to the fact that another employee, a black male, who was working for the agency as a WG–1 Laborer, was given an extension of his temporary seasonal appointment around the same time that plaintiff was terminated. Second, plaintiff argues that his immediate supervisor, Robert Guellich, wanted to be rid of plaintiff because he was a "problem." See Transcript of Hearing, Def. Exh. R, Doc. 14, at 69–70. Third, plaintiff points to the fact that his work performance appraisals were fully successful. Judging these circumstances in a light most favorable to plaintiff, as the court must when analyzing defendant's summary judgment motion, the court finds that a material issue of fact exists concerning an inference of discrimination. Since a jury reasonably could infer from the circumstances that plaintiff was terminated as a result of racial discrimination, plaintiff has met his burden of presenting a prima facie case.

### 2. *Defendant's Nondiscriminatory Purpose*

Under *McDonnell Douglas*, once a prima facie case is established by a Title VII plaintiff, a presumption arises that the defendant unlawfully discriminated against plaintiff. *Hicks*, —— U.S. at ——, 113 S.Ct. at 2747. In order to rebut that presumption, defendant must produce evidence that the adverse action was taken for legitimate, nondiscrimi-

natory reasons. *Id.* As noted in *Hicks*, defendant's burden is one merely of production. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* (quoting *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093).

■ In the instant case, defendant has produced sufficient evidence to rebut any presumption of discrimination arising out of plaintiff's argument. Under administrative rules developed to guide federal employers, an agency is authorized to effect a RIF when faced with a shortage of funds. 5 C.F.R. § 351.201(a)(2). That is the reason given to plaintiff in his Separation Notice, and has been the reason proffered by Superintendent Jackson from the beginning of this controversy. *See* Separation Notice, Def. Exh. H, Doc. 14; Jackson Affidavit, attached to Doc. 13, at ¶¶ 8–12. As superintendent of FOST, Jackson is responsible for preparing the park's annual budget. Jackson Affidavit, attached to Doc. 13, at ¶ 6. For two years preceding the RIF in question, the annual budget of FOST was reduced, first by fifteen percent in Fiscal Year ("FY") 1986 and then by ten percent in FY 1987. *Id.* at ¶ 7. A further ten percent cut was forecast for FY 1988, but due to protracted budget negotiations in Congress FOST was without a concrete projection of the amount of funding it could expect until February 1988. *Id.* at ¶ 8. Nonetheless, it is clear that superintendents of national parks throughout the North Atlantic region expected further cutbacks of at least eight percent for FY 1988. *See* Cables Memorandum dated Nov. 10, 1987, Def. Exh. V, Doc. 14. In anticipation of this cutback, Jackson proposed to eliminate plaintiff's position. He projected that by eliminating the WG–3 position while extending the WG–1 Laborer's appointment, FOST could save approximately $4,000 in FY 1988. Jackson Affidavit, attached to Doc. 13, at ¶ 18; Jackson Memorandum dated Dec. 4, 1987, Def. Exh. K, Doc. 14. This was true not only because the WG–1 Laborer was paid less, but also because he had no right to health or retirement benefits. By terminating plaintiff when he did, Jackson also avoided the additional costs that would have attended plain-

tiff's conversion to permanent employee status. That conversion was due on September 26, 1988, and would have entitled plaintiff to a step increase in pay. Jackson Affidavit, attached to Doc. 13, at ¶ 13. Plaintiff's duties, Mr. Jackson decided, could be performed in part by the WG–1 Laborer, and in part by higher-graded employees. According to Jackson, the decision to cut personnel was a natural outgrowth of the fact that personnel costs accounted for eighty-five percent of the FOST budget. Jackson Affidavit, attached to Doc. 13, at ¶ 9.

Defendant's evidence on the existence of a nondiscriminatory purpose for firing plaintiff is well documented. Even viewing the evidence most favorably to plaintiff, defendant satisfies its burden by putting forth a nondiscriminatory rationale for plaintiff's termination.

### 3. *Plaintiff's Evidence on Pretext*

Since defendant has rebutted the inference of discrimination by producing a legitimate, nondiscriminatory reason for dismissing plaintiff, the presumption of discrimination disappears and plaintiff must go forward to prove the ultimate issue of the case. That is, plaintiff must show by a preponderance of the evidence that defendant discriminated against him because of his race. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2753. Plaintiff may not meet this burden simply by discrediting defendant's proffered explanation, although evidence of pretext may be probative of the existence of discriminatory purpose. *Id.*

While plaintiff contends that he has such evidence, he fails to raise even one relevant argument tending to show that defendant's reasons for terminating him were pretextual. Although the evidence offered by plaintiff is somewhat disorganized, the court discerns five distinct arguments directed at proving discrimination. Each will be addressed in turn.

■ First, plaintiff asserts that FOST erred when it estimated that approximately $4,000 could be saved by implementing the RIF. Even assuming, for the sake of argument, that this assertion is true, it has no

bearing on the outcome of this litigation. The issue in a discrimination case is not whether the basis on which the employer acted was sound; it is whether that basis was unlawful. As explained by the Eleventh Circuit, the reason offered by the defendant may be "a good reason, a bad reason, a reason based on erroneous facts, or ... no reason at all, as long as its action is not for discriminatory reasons." *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187, *reh'g denied en banc,* 747 F.2d 710 (11th Cir.1984).

Similarly, plaintiff argues that the RIF was not an absolute economic necessity. To this end he offers as evidence a newspaper article in which Superintendent Jackson is quoted as stating that admission fees might help FOST retain many employees who might otherwise be released due to cutbacks. Newspaper Article, Plaintiff's Exhibit ("P. Exh.") 7, Doc. 16. Another article quotes Jackson as predicting that FOST would have a good season despite budget problems. Newspaper Article, P. Exh. 8, Doc. 16. Plaintiff submits a third article that notes that money lost by projected budget cuts might be recouped through more proceeds from the FOST store, Newspaper Article, P. Exh. 11, Doc. 16, and yet another that advocates a hiring freeze as an alternative to layoffs in the federal work force as a whole. Newspaper Article, P. Exh. 9, Doc. 16.

Again, the issue of whether some better way to save money at FOST for FY 1988 was available is not one for this court to decide. Such a consideration simply is not relevant to a determination of whether the separation of plaintiff from the NPS was determined by plaintiff's race. While Title VII actions inevitably necessitate allowing plaintiffs an opportunity to show that their employer acted in an illegitimate manner, the statute does not hand federal courts "a roving commission to review business judgments." *Montana v. First Federal Savings & Loan Ass'n of Rochester,* 869 F.2d 100, 106 (2d Cir.1989) (citing *Graefenhain v. Pabst Brewing Co.,* 827 F.2d 13, 21 n. 8 (7th Cir.1987)); *see also Meiri,* 759 F.2d at 995.

■ Third, plaintiff argues that he was released, rather than William Timms, be-

cause Robert Guellich held a personal animus against him. In testimony elicited by plaintiff before the MSPB, an administrative technician at FOST testified that Guellich told her plaintiff would never reach permanent status, that plaintiff was a "big problem," and that she should ask the personnel office how plaintiff could be eliminated. Transcript of Hearing, Def. Exh. R, Doc. 14, at 69–70. Again, assuming the truth of this testimony, the court finds that it has no relevance to the question of whether *racial* animus was involved in plaintiff's discharge from the NPS. While such evidence tends to prove personal animosity, it is not probative of racial tension. In fact, two witnesses called by plaintiff during the administrative hearing, also white males, testified that they did not believe race or racial considerations had anything to do with the elimination of plaintiff's position. *Id.*, at 72. No witness testified otherwise.

■ Plaintiff's fourth argument is that defendant's failure to offer plaintiff any alternative employment opportunities is circumstantial evidence that defendant's explanation for the termination is pretextual. The court finds this argument equally unavailing because as a TAPER employee at the time of his separation from the NPS plaintiff had no right to further employment. No one replaced plaintiff in the WG–3 position; the position was eliminated. Under such circumstances, despite the fact that plaintiff was qualified for that or a similar position, defendant had no obligation to offer plaintiff another position. Hence, plaintiff raises no issue of fact regarding racial discrimination with this argument. Indeed, as noted by one court, "proof of general qualifications is less relevant in a reduction-in-force claim because *someone has to be let go.*" *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 235 (4th Cir.1991) (emphasis in original). In this case, at least seven position were eliminated at FOST between 1987 and 1993. *See* Jackson Affidavit, attached to Doc. 13, at ¶ 3.

Plaintiff also notes that he was not offered the seasonal WG–1 position that was extended for several months after plaintiff's dismissal. Instead, a black male employee who was already filling the position was kept on until the end of 1987. According to Jackson and Guellich, the position was offered to this employee instead of plaintiff because a WG–1 employee is paid less and is not entitled to health benefits, and because plaintiff did not express interest in the position. Jackson Affidavit, attached to Doc. 13, at ¶ 14; Guellich Affidavit, attached to Doc. 13, at ¶¶ 11, 13. Plaintiff further highlights to the court that the black male was kept at the expense of another, more senior white male, who was let go in addition to plaintiff. This argument ignores the fact that the senior employee was unavailable to continue work, since he was returning to school. Jackson Affidavit, attached to Doc. 13, at ¶ 14. Thus, the circumstances of the retention of the seasonal employee through the end of 1987 is neither inconsistent with defendant's proffered rationale nor indicative of racial discrimination.

Finally, plaintiff points to the existence of an Affirmative Action Plan at FOST as evidence that he was a victim of reverse discrimination. *See* FOST Affirmative Action Plan, Def. Exh. O, Doc. 14; Memorandum From J.D. Foy to Jackson dated June 29, 1987, Def. Exh. P, Doc. 14. The mere existence of such a plan, however, is not sufficient for plaintiff to meet his burden of identifying a material issue of fact. Plaintiff was not replaced by a minority worker. His position was simply eliminated. Nor can plaintiff claim that he was treated differently than a similarly situated minority employee. There is no evidence tending to indicate that the Affirmative Action Plan had any bearing on plaintiff whatsoever.

In short, the court finds no concrete evidence to rebut defendant's proffered reasons for initiating the RIF that resulted in plaintiff's termination from the NPS. At best, plaintiff's evidence is "merely colorable," which the Supreme Court has held insufficient to withstand a summary judgment motion. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Because there is nothing in the record to indicate that race was a motivating factor in plaintiff's release from the NPS, summary judgment is appropriate in this instance, and is hereby granted.

### III. CONCLUSION

In sum, defendant's motion for summary judgment pursuant to Fed.R.Civ.P. 56(c) is granted for the aforementioned reasons. The Clerk of the Court is directed to enter judgment in favor of defendant dismissing the action in its entirety.

It is So Ordered.